# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SYED ASIF ALI, Derivatively on Behalf of MODERNA, INC., | Case No: |
| Plaintiff, | |
| v. | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| STEPHANE BANCEL, JAMES M. MOCK, STEPHEN HOGE, NOUBAR AFEYAN, SANDRA HORNING, ELIZABETH NABEL, FRANCOIS NADER, PAUL SAGAN, ELIZABETH TALLETT, ROBERT LANGER, and STEPHEN BERENSON, | |
| Defendants, | **JURY TRIAL DEMANDED** |
| and, | |
| MODERNA, INC., | |
| Nominal Defendant. | |

Plaintiff Syed Asif Ali ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Moderna, Inc. ("Moderna" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by the Company with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought in the right, and for the benefit, of the Company against certain of its officers and directors seeking to remedy Defendants' violations of state and federal law that have occurred from January 18, 2023 through the present (the "Relevant Period") and have caused substantial harm to the Company.

## JURISDICTION

2.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and the Company's Federal Forum Provision[1] as the claims asserted herein arise under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act").  This Court also has jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

3.      This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

4.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because: (i) the Company maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to the Company, occurred in this District; and (iv) Defendants have received

---

[1]      The Company's Federal Forum Provision states that "The Delaware Forum Provision will not apply to any causes of action arising under the Securities Act or the Exchange Act. Our by-laws further provide that the U.S. District Court for the District of Massachusetts is the exclusive forum for resolving any complaint asserting a cause of action arising under the Securities Act."

substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

5.      In connection with the acts, transactions, and conduct alleged herein, the Individual Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## THE PARTIES

### Plaintiff

6.      Plaintiff is, and was at relevant times, a shareholder of the Company.  Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

### Nominal Defendant

7.      *Nominal Defendant Moderna* is a Delaware corporation with principal executive offices located at 325 Binney Street, Cambridge, Massachusetts 02142.  The Company's common stock trades in an efficient market on the Nasdaq Stock Market ("NASDAQ") under the ticker symbol "MRNA."

### Director Defendants

8.      *Defendant Stephane Bancel* ("Bancel") has served as Moderna's Chief Executive Officer ("CEO") since October 2011 and as a director of the Company since March 2011.

9.      *Defendant Noubar Afeyan* ("Afeyan") has served as Chairman of the Company since 2012 and as a director since 2010.  Defendant Afeyan is also the Company's co-founder.  He also serves as the chair of the Nominating and Corporate Governance Committee.

10.     **_Defendant Sandra Horning_** ("Horning") has served as a director of the Company since 2020.  She also serves as the chair of the Product Development Committee and as a member of the Science and Technology Committee and the Compensation and Talent Committee.

11.     **_Defendant Elizabeth Nabel_** ("Nabel") has served as a director of the Company since 2015.  She also serves as the chair of the Science and Technology Committee and as a member of the Product Development Committee and the Compensation and Talent Committee.

12.     **_Defendant Francois Nader_** ("Nader") has served as a director of the Company since 2019.  He also serves as the chair of the Compensation and Talent Committee and as a member of Product Development Committee and the Science and Technology Committee.

13.     **_Defendant Paul Sagan_** ("Sagan") has served as a director of the Company since 2018.  He also serves as a member of the Audit Committee and as a member of the Nominating and Corporate Governance Committee.

14.     **_Defendant Elizabeth Tallett_** ("Tallett") has served as a director of the Company since 2020.  She also serves as the Chair of Audit Committee and as a member of the Compensation and Talent Committee.

15.     **_Defendant Robert Langer_** ("Langer") served as a director of the Company from 2010 through to July 2024. Defendant Langer is also a co-founder of the Company.

16.     **_Defendant Stephen Berenson_** ("Berenson") served as a director of the Company from 2017 through to July 2024.

17.     Defendants Bancel, Afeyan, Horning, Nabel, Nader, Sagan, Tallett, Langer, and Berenson are collectively referred to herein as the "Director Defendants."

**Officer Defendants**

18.    **Defendant James M. Mock** ("Mock") has served as Moderna's Chief Financial Officer ("CFO") since September 2022.

19.    **Defendant Stephen Hoge** ("Hoge") has served as Moderna's President since February 2015 and joined Moderna in January 2013.

20.    Defendant Mock and Hoge along with Defendant Bancel are collectively referred to herein as the "Officer Defendants."

21.    The Director Defendants along with the Officer Defendants are collectively referred to herein as the "Individual Defendants."

## FACTS

### Background

22.    Moderna, founded in 2010, is a biotechnology company that discovers, develops, and commercializes mRNA therapeutics and vaccines for the treatment of infectious diseases, immuno-oncology, rare diseases, autoimmune, and cardiovascular diseases in the U.S., Europe, and internationally. The Company's products include, *inter alia*, mRESVIA (mRNA-1345), an mRNA RSV vaccine, to protect adults aged 60 years and older from lower respiratory tract disease caused by RSV infection.

### MATERIALLY FALSE AND MISLEADING STATEMENTS

23.    The Relevant Period begins on January 18, 2023, the day after Moderna issued a press release during post-market hours entitled "Moderna Announces mRNA-1345, an Investigational Respiratory Syncytial Virus (RSV) Vaccine, Has Met Primary Efficacy Endpoints in Phase 3 Trial in Older Adults." The press release stated, in relevant part:

> Moderna [. . .] today announced positive topline data from its ConquerRSV Phase 3 pivotal efficacy trial of mRNA-1345, an investigational mRNA vaccine targeting respiratory syncytial virus (RSV) in older adults. ***Following review by an independent Data and Safety Monitoring Board (DSMB), the primary efficacy***

*endpoints have been met, including vaccine efficacy (VE) of 83.7% (95.88% CI: 66.1%, 92.2%; p<0.0001) against RSV-associated lower respiratory tract disease (RSV-LRTD) as defined by two or more symptoms*. Based on these results, Moderna intends to submit for regulatory approval in the first half of 2023.

"Today's results represent an important step forward in preventing lower respiratory disease due to RSV in adults 60 years of age and older. These data are encouraging, and represent the second demonstration of positive phase 3 trial results from our mRNA infectious disease vaccine platform after, Spikevax, our COVID-19 vaccine. We look forward to publishing the full data set and sharing the results at an upcoming infectious disease medical conference," said [Defendant] Bancel[.] "Respiratory diseases are a major public health priority given they have a significant health impact and are a leading cause of hospitalization. For these reasons, in addition to our mRNA-1345 RSV vaccine candidate, we are committed to developing a portfolio of respiratory mRNA vaccines to target the most significant viruses causing respiratory disease, including COVID-19, influenza, and human metapneumovirus."  [Emphasis added].

24.    On January 30, 2023, Moderna issued a press release entitled "Moderna Granted FDA Breakthrough Therapy Designation for mRNA-1345, An Investigational Respiratory Syncytial Virus (RSV) Vaccine Candidate." The press release stated, in relevant part:

Moderna [. . .] today announced mRNA-1345, an investigational mRNA vaccine candidate for respiratory syncytial virus (RSV), has been granted Breakthrough Therapy Designation by the U.S. Food and Drug Administration (FDA) for the prevention of RSV-associated lower respiratory tract disease (RSV-LRTD) in adults aged 60 years or older. The designation was based on positive topline data from the ConquerRSV Phase 3 pivotal efficacy trial.

"The FDA's Breakthrough Designation for mRNA-1345 further emphasizes the significant health impact of RSV in older adults and the high unmet need," said [Defendant] Bancel[.] "With this designation, we look forward to productive conversations with the FDA in the hopes of bringing our RSV vaccine candidate for older adults to the market safely and quickly. Moderna's mRNA platform has now demonstrated two positive Phase 3 infectious disease trial results and we continue to advance a portfolio of respiratory mRNA vaccines targeting the most serious diseases. We are grateful to the FDA for this designation."

The FDA's Breakthrough Therapy Designation is granted to expedite the development and review of drugs that are intended to treat a serious condition, and when preliminary clinical evidence indicates the drug or vaccine may demonstrate substantial improvement over available therapy on a clinically significant endpoint(s).

25.     On February 23, 2023, Moderna issued a press release announcing the Company's

fiscal Q4 and full year 2022 financial results. The press release stated, in relevant part:

> "2022 was another impressive year for Moderna, with over $19 billion in revenue
> and significant clinical breakthroughs across our portfolio. We continue to provide
> our Omicron-targeting bivalent vaccines worldwide, with the latest real-world
> evidence highlighting the continued protection of our vaccines against
> hospitalization and death," said [Defendant] Bancel[.] "Our infectious disease
> platform continues to progress with positive Phase 3 data in RSV for older adults.
> We are investing to scale Phase 3 manufacturing for personalized cancer vaccines
> so that we can run several Phase 3 studies simultaneously. With planned R&D
> investments of $4.5 billion for the year, I am excited about the new medicines we
> believe we will bring to patients in the coming few years."
>
> ***
>
> - ***RSV vaccine in older adults (mRNA-1345) met its primary efficacy
>   endpoint and received Breakthrough Therapy Designation from FDA.
>   mRNA-1345 demonstrated vaccine efficacy of 83.7% against RSV lower
>   respiratory tract disease, defined by 2 or more symptoms, and 82.4% with
>   3 or more symptoms in older adults.*** mRNA-1345 was generally well-
>   tolerated, with no safety concerns identified by the Data Safety Monitoring
>   Board (DSMB). Based on these results, Moderna expects to submit a
>   Biologics License Application (BLA) for mRNA-1345 to the FDA in the
>   first half of 2023. The pediatric Phase 1 trial of mRNA-1345 is fully
>   enrolled. [Emphasis added].

26.     That same day, Moderna hosted an earnings call with investors and analysts to

discuss the Company's Q4 2022 results (the "Q4 2022 Earnings Call"). During the scripted portion

of the Q4 2022 Earnings Call, Defendant Hoge stated, in relevant part:

> And moving to RSV, as you know, we shared the top line results from our Phase 3
> RSV study in older adults earlier this year. And today, we shared additional data
> that was presented this morning at RSVVW. ***The top line results we have seen are
> incredibly encouraging and we are grateful to the FDA for breakthrough therapy
> designation for mRNA-1345, which further emphasizes the significant health
> impact of RSV in older adults and the high unmet need. In the top line data
> presented in January, the mRNA-1345 demonstrated 83.7% vaccine efficacy and
> the primary endpoint of lower respiratory tract disease with two or more
> symptoms.*** 1345 was found to be generally well tolerated and there were no safety
> concerns identified by the Data and Safety Monitoring Board. [Emphasis added].

27.    On February 24, 2023, Moderna filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2022 (the "2022 10-K"). The 2022 10-K was signed by Defendants Bancel, Mock, Afeyan, Berenson, Horning, Langer, Nader, Nabel, Sagan, and Tallett.  The 2022 10-K also contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Bancel and Mock, attesting to the accuracy and truthfulness of the 2022 10-K as well as the accuracy of all financial reporting.

28.    In providing an overview of the Company's strategy, the 2022 10-K stated, in relevant part:

> We believe that the development of mRNA medicines represents a significant breakthrough for patients, our industry and human health globally. Our success in developing a highly effective vaccine against COVID-19, going from sequence selection, conducting clinical trials and to receipt of regulatory authorization for emergency use, all in less than a year, and subsequently receiving BLA approval from the FDA, provides a visible example of the promise of mRNA medicine. The Moderna COVID-19 Vaccine/Spikevax has been authorized for use or approved in over 70 countries. As our first approved product, Spikevax has helped hundreds of millions of people worldwide combat the COVID-19 pandemic. We believe our success in developing our COVID-19 vaccines has positive implications beyond infectious disease vaccines and across our entire pipeline. We currently have 48 programs in development, and our pipeline spans infectious diseases, including vaccines against respiratory diseases, latent diseases and public health pathogens, as well as four therapeutic areas: immuno-oncology, rare diseases, cardiovascular diseases and autoimmune diseases.

> In order to deliver on the full scope of the mRNA opportunity and maximize long-term value for patients and investors, we have formulated strategic priorities that guide our near-term and long-term goals:

> 1.  **Execute our commercialization plans for our COVID-19 vaccines.** Our COVID-19 vaccines have been approved in more than 70 countries. We are transitioning to prepare for an endemic, commercial market for COVID-19 vaccines in the United States and other countries. We are working to build a differentiated commercial model, with active commercial subsidiaries across North America, Europe and the Asia-Pacific region, providing us with local commercial teams in key markets around the world.

2. **Build an unrivaled seasonal respiratory vaccine franchise.** As we build our respiratory franchise, we are applying our experience and using our mRNA platform to develop medicines that can help prevent hospitalizations and deaths from the most prevalent respiratory viruses. We are currently developing vaccines against COVID-19, seasonal flu and RSV individually, while pursuing parallel development of combination vaccines. In January 2023, we announced that our older adult RSV vaccine candidate had met its primary efficacy endpoints in a Phase 3 trial. Our long-term vision is to develop, and seek regulatory approval for, a convenient, annual, single-dose booster against as many respiratory viruses as possible. mRNA vaccines have the ability to combine multiple different antigens into one vaccine. We believe that combination vaccines have the potential to improve health outcomes at lower costs due to higher compliance, better uptake, a larger benefit to the healthcare system (including through reduced vaccine administration costs) and increased consumer convenience. We have preparations underway for multiple potential vaccine launches globally over the next several years.

29.    Further, in providing an overview of mRNA-1345, the 2022 10-K stated, in relevant part:

*We are developing an RSV vaccine for children and adults. In older adults, mRNA-1345 reported positive topline Phase 3 efficacy results in January 2023; in pediatrics, mRNA-1345 is ongoing in a Phase 1 study.*

*** *

mRNA-1345 encodes an engineered form of the RSV F protein stabilized in the prefusion conformation and is formulated in our proprietary LNP. We believe that neutralizing antibodies elicited by mRNA-1345 may lead to an efficacious RSV vaccine.

*Latest data and next steps*

In January 2023, we announced that mRNA-1345 had met primary efficacy endpoints in the pivotal Phase 3 trial in older adults, ages 60 and older. mRNA-1345 demonstrated vaccine efficacy (VE) of 83.7% (95.88% CI: 66.1%, 92.2%; p<0.0001) against RSV-associated lower respiratory tract disease (RSV-LRTD) as defined by two or more symptoms. The other primary efficacy endpoint against RSV-LRTD defined by three or more symptoms was also met, with a VE of 82.4% (96.36% CI: 34.8%, 95.3%; p=0.0078). mRNA-1345 was generally well-tolerated with no safety concerns identified by the DSMB. The overall rate of severe (Grade 3 or greater) solicited systemic adverse reactions was 4.0% for mRNA-1345 and 2.8% for placebo. The overall rate of Grade 3 or greater solicited local adverse

reactions was 3.2% for mRNA-1345 and 1.7% for placebo. The study is ongoing, and an updated analysis of safety and tolerability will be provided at the time of regulatory submission.

Based on the positive topline data from the pivotal Phase 3 efficacy trial, the FDA granted mRNA-1345 Breakthrough Therapy Designation for the prevention of RSV-LRTD in adults 60 years or older. We intend to submit mRNA-1345 to the FDA for regulatory approval for older adults in the first half of 2023.

30.    On April 11, 2023, the Company issued a press release entitled "Moderna Announces Clinical and Program Updates at 4th Vaccines Day."  The press release stated, in relevant part:

**mRNA-1345**

mRNA-1345, Moderna's RSV vaccine candidate, is in an ongoing Phase 2/3, randomized, observer-blind, placebo-controlled case-driven trial (ConquerRSV) in adults aged 60 years and older. In this study, 35,541 participants from 22 countries were randomized 1:1 to receive one dose of mRNA-1345 or placebo.

Following review by an independent Data and Safety Monitoring Board (DSMB), the primary efficacy endpoints have been met, ***including vaccine efficacy (VE) of 83.7%*** (95.88% CI: 66.1%, 92.2%; $p<0.0001$) against RSV-associated lower respiratory tract disease (RSV-LRTD) as defined by two or more symptoms.

Vaccine efficacy was maintained in participants over 70 years of age and participants with comorbidities. mRNA-1345 was well tolerated; solicited adverse reactions were mostly grade 1 or grade 2 in severity. No cases of Guillain-Barre Syndrome (GBS) have been reported.

mRNA-1345 has been granted Breakthrough Therapy Designation (BTD) by the FDA for the prevention of RSV-LRTD in adults aged 60 years or older.

31.    On May 4, 2023, Moderna hosted an earnings call with investors and analysts to discuss the Company's Q1 2023 results (the "Q1 2023 Earnings Call").  During the scripted portion of the Q1 2023 Earnings Call, Defendant Hoge stated, in relevant part:

Moving to RSV, we're pleased by the profile of our vaccine in older adults with high and consistent efficacy against RSV lower respiratory tract disease across populations in our large Phase 3 study.

***At two recent medical meetings, we've shared data showing our vaccine's efficacy was consistently high across all age groups, including in the oldest adult and in participants with preexisting comorbidities that put them at higher risk***. mRNA-1345 has also shown a favorable tolerability profile with AEs mostly grade 1 or grade 2, mild to moderate. As we shared during Vaccines Day, today, we have not seen any cases of Guillain-Barré syndrome or other severe demyelinating events in the trial.

32.    On July 5, 2023, the Company issued a press release entitled "Moderna Announces Global Regulatory Submissions For Its Respiratory Syncytial Virus (RSV) Vaccine, MRNA-1345."  The press release stated, in relevant part:

"We are proud to announce these filings for the use of our RSV vaccine candidate, mRNA-1345, in the European Union, Switzerland, Australia, and the U.S. RSV is a major cause of lower respiratory tract infections in older adults and can cause a significant burden to health systems through hospitalizations and emergency care admissions," said [Defendant] Bancel[.] "Our mRNA platform has allowed us to move from initial clinical testing to our first international Phase 3 trial to initiation of regulatory submissions for mRNA-1345 in just two years, enabling us to tackle this pervasive public health burden with speed and clinical rigor. mRNA-1345 represents the second product coming from our mRNA platform to seek global approval, and with recent positive data in rare disease and cancer, we expect more in the future - further demonstrating the tremendous potential of mRNA to combat disease."

33.    Further, the press release reiterated that "mRNA-1345 met primary efficacy endpoints, demonstrating vaccine efficacy of 83.7% against RSV lower respiratory tract disease in older adults in the Phase 3 pivotal efficacy trial[.]"

34.    On August 3, 2023, Moderna issued a press release announcing the Company's Q2 2023 financial results.  The press release stated, in relevant part:

"Second quarter sales were on target, given the seasonal nature of Covid. I am pleased with the progress our U.S. commercial team has made to get new contracts in place for fall 2023. We are on track to deliver 2023 sales between $6 billion to $8 billion, depending on Covid vaccination rates in the U.S.," said [Defendant] Bancel[.] "Our late-stage clinical pipeline is firing on all cylinders with four infectious disease vaccines in Phase 3, including RSV which was recently submitted to regulators for approval. Our individualized neoantigen therapy is now in Phase 3 for melanoma and our lead rare disease program for PA is in dose confirmation. We believe that all these products should launch in 2024, 2025 or

2026, and we are continuing to invest in scaling Moderna to bring forward an unprecedented number of innovative mRNA medicines for patients."

35.    That same day, Moderna hosted an earnings call with investors and analysts to discuss the Company's Q2 2023 results (the "Q2 2023 Earnings Call"). During the scripted portion of the Q2 2023 Earnings Call, Defendant Bancel stated, in relevant part: "[w]e've also started to manufacture mRNA-1345 in preparation for the launch. As a reminder, at launch, these products will be in a prefilled syringe presentation, *which combined with the strong efficacy profile will position very well our product to healthcare professionals*."

36.    Also, during the scripted portion of the Q2 2023 Earnings Call, Defendant Hoge stated, in relevant part:

> Moving to RSV. As [Defendant Bancel] mentioned earlier, we are pleased to be on track for regulatory approvals in 2024. Earlier this month, we announced a rolling submission to the FDA, and we plan to use a priority voucher to accelerate that review. We also filed additional regulatory applications in Europe, Switzerland, Australia, and the UK. *We're incredibly encouraged by the profile of mRNA-1345 and look forward to the expected commercial launch next year*. [Emphasis added].

37.    On September 13, 2023, the Company issued a press release entitled "Moderna Expands the Field of mRNA Medicine with Positive Clinical Results Across Cancer, Rare Disease, and Infectious Disease." The press release stated in relevant part:

### Expanding the Field of mRNA Medicine

> Moderna was founded and built to use nature's information molecule, mRNA, to treat and prevent disease. The premise has always been that an mRNA-based approach to making medicine could advance at the pace of information, leveraging common science, technology, and infrastructure to create medicines addressing high unmet needs at unprecedented speed and efficiency.

> Through more than a decade of investment in science, the Company has created the field of mRNA medicine. The Company has advanced a diverse pipeline and demonstrated the potential for clinical benefit in cancer (mRNA-4157), in three different rare diseases (mRNA-3705, mRNA-3927, mRNA-3745), and multiple infectious disease vaccine (mRNA-1273, mRNA-1345, mRNA-1010). The

Company has advanced six programs into late-stage development, including two approved or filed for approval, and three more that have completed Phase 3 enrollment. The Company expects to double the number of programs in Phase 3 by 2025 and launch up to 15 products in five years across cancer, rare disease, and infectious disease. Up to four of those launches could come by 2025.

38.     Further, the above press release reiterated that mRNA-1345 "met both its primary efficacy endpoints, with a vaccine efficacy (VE) of 83.7%[.]"

39.     On November 2, 2023, Moderna issued a press release announcing the Company's Q3 2023 financial results.  The press release reiterated that mRNA-1345 "met both its primary efficacy endpoints, with a vaccine efficacy (VE) of 83.7%" and stated, in relevant part:

> ***Moderna is preparing for the marketing launch of mRNA-1345 and believes its U.S. COVID-19 market share to date demonstrates the Company's ability to compete in the commercial market***. The Company is encouraged by early indications of strong consumer awareness and demand in the RSV market. Moderna believes that clinical data for its RSV vaccine supports a best-in-class profile and that its ready-to-use pre-filled syringes (PFS) offer another competitive differentiator over currently licensed products, which require multiple preparatory steps by pharmacists and clinicians. Feedback from clinicians and customers in the COVID-19 market, where Moderna has a similar presentation, validates the benefits of PFS administration. The Company's pre-launch activities at this time are largely focused on scientific exchanges and public health engagements. [Emphasis added].

40.     On December 14, 2023, the Company issued a press release entitled "Moderna Announces New England Journal of Medicine Publication of Pivotal Phase 3 Clinical Safety and Efficacy Data For MRNA-1345, the Company's Investigational Respiratory Syncytial Virus (RSV) Vaccine."  The press release stated, in relevant part:

> RSV is a highly contagious virus that causes severe disease across the age spectrum, including older adults. Each year in the U.S., RSV leads to approximately 60,000-160,000 hospitalizations and 6,000-10,000 deaths among older adults. Applications for mRNA-1345 have been submitted to regulators around the world. Moderna is actively preparing for an expected 2024 marketing launch of mRNA-1345 and believes its U.S. COVID-19 market share to date demonstrates the Company's ability to compete in the commercial market. If approved, mRNA-1345 would have a potential best-in-class profile and be the only ready-to-use RSV vaccine available in single-dose prefilled syringes.

41.     On February 22, 2024, Moderna issued a press release announcing the Company's Q4 and full year 2023 results which reiterated that mRNA-1345 "met both its primary efficacy endpoints, with a vaccine efficacy (VE) of 83.7%[.]"

42.     That same day, Moderna hosted an earnings call with investors and analysts to discuss the Company's Q4 2023 results (the "Q4 2023 Earnings Call"). During the scripted portion of the Q4 2023 Earnings Call, Defendant Hoge stated, in relevant part:

> Moving to our RSV vaccine candidates, we are very excited about launching the RSV vaccine this year. That will be the launch of our second product. Our mRNA platform is delivering. The FDA PDUFA date is May 12. If the outcome is positive, we anticipate that ACIP will include mRNA-1345 on the agenda in late June.
>
> Let me now turn to our RSV vaccine profile. ***We believe we have the best profile to serve patients and completing the RSV market, efficacy, safety, and ease of use. Our clinical data shows strong vaccine efficacy***. We have a well-established safety and tolerability profile that leverages the same mRNA technology that has been delivered in over 1 billion COVID vaccines. Additionally, we have not seen any case of Guillain-Barre Syndrome or GBS in our Phase 3 trials.  [Emphasis added].

43.     On February 23, 2024, Moderna filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2023 (the "2023 10-K"). The 2023 10-K was signed by Defendants Bancel, Mock, Afeyan, Berenson, Horning, Langer, Nader, Nabel, Sagan, and Tallett. The 2023 10-K also contained certifications pursuant to SOX signed by Defendants Bancel and Mock, attesting to the accuracy and truthfulness of the 2022 10-K as well as the accuracy of all financial reporting.

44.     The 2023 10-K contained substantively similar descriptions of the Company's strategy and overview of mRNA-1345 as discussed *supra*.

45.    On March 27, 2024, the Company issued a press release entitled "Moderna Advances Multiple Vaccine Programs to Late-Stage Clinical Trials" which reiterated that mRNA-1345 "met both its primary efficacy endpoints, with a vaccine efficacy (VE) of 83.7%[.]"

46.    The above-referenced statements were materially false and/or misleading because the Individual Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, the Individual Defendants made false and/or misleading statements and/or failed to disclose that: (i) mRNA-1345 was less effective than the Individual Defendants had led investors to believe; (ii) accordingly, mRNA-1345's clinical and/or commercial prospects were overstated; and (iii) as a result, the Company's public statements were materially false and misleading at all relevant times.

## THE TRUTH EMERGES

47.    On May 31, 2024, Moderna issued a press release "announc[ing] that the [FDA] has approved mRESVIA (mRNA-1345) . . . to protect adults aged 60 years and older from lower respiratory tract disease caused by RSV infection."  However, the Company's press release indicated a vaccine efficacy of only 78.7%, significantly lower than the 83.7% vaccine efficacy rate that Moderna had previously identified in its July 2023 BLA rolling submission to the FDA.

48.    Following this announcement, market analysts took notice of mRNA-1345's lower-than-expected vaccine efficacy rate.  For example, *Reuters* published an article that same day entitled "US FDA approves Moderna's RSV vaccine with lower-than-expected efficacy in its label," which stated, in relevant part:

> The U.S. Food and Drug Administration approved Moderna's (MRNA.O), opens new tab respiratory syncytial virus (RSV) vaccine, the company announced on Friday, giving it a shot at much-needed new revenue from a second product. Moderna's vaccine was approved for the prevention of RSV-associated lower respiratory tract disease in adults aged 60 or older, ***but with a label indicating the***

*shot was 79% effective at preventing at least two symptoms of RSV, such as cough and fever*.

Moderna had filed for FDA approval in July on data from a late-stage trial that showed its vaccine was 84% effective at preventing those symptoms, and its shares were down more than 6% in afternoon trading.  [Emphasis added].

49.     On this news, Moderna's stock price fell $8.94 per share, or 5.9%, to close at $142.55 per share on May 31, 2024.

50.     Then, on June 26, 2024, in a presentation before the CDC's Advisory Committee on Immunization Practices, Moderna disclosed that after 18 months, mRNA-1345 proved only 49.9% to 50.3% effective against multiple symptoms of lower respiratory tract disease—a significantly lower efficacy rate than vaccines produced by Moderna's competitors.

51.     Following this presentation, market analysts once again took notice of mRNA-1345's reduced efficacy rate.  For example, in an article entitled "Moderna says its RSV shot is 50% effective across a second season," *Reuters* stated, in relevant part:

Moderna [. . .] opens new tab respiratory syncytial virus (RSV) shot mRESVIA showed 50% efficacy in preventing RSV after 18 months, the drugmaker said on Wednesday.

In their clinical trials, GSK's RSV vaccine Arexvy was 78% effective in preventing severe RSV over a second year and Pfizer's was 78% effective through a second RSV season.

Moderna presented the data at a meeting of the U.S. Centers for Disease Control and Prevention's Advisory Committee on Immunization Practices. The drugmaker has previously cautioned against comparing its vaccine to rivals, noting that the trials were not head-to-head and used different case definitions for RSV disease.

52.     In addition, *Bloomberg* published an article entitled "Moderna RSV Vaccine Efficacy Sinks Over Time, CDC Documents Show," which stated, in relevant part:

Moderna [. . .] shares sank after new data showed the efficacy of its RSV shot fell sharply in the second year and was lower than that of rival vaccines.

The results could further raise doubts over the prospects for its shot, which is already third to the market. Moderna shares fell as much as 11%, their biggest intraday decline since November.

Moderna's shot dropped from 55% efficacy over the first 12 months to 36% in the second year in patients with at least three "lower respiratory" symptoms of RSV, according to documents posted Wednesday on the Centers for Disease Control and Prevention website.

*** 

Jefferies analyst Michael Yee said in a research note that Moderna's new figures were "on the lower end of expectations," while pointing out that comparisons were difficult because the companies studied their vaccines during different seasons.

53.    On this news, Moderna's stock price fell $15.15 per share, or 11.01%, to close at $122.45 per share on June 26, 2024.

54.    As a result of the Individual Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, the Company has suffered significant losses and damages.

## DAMAGE TO THE COMPANY

### Securities Class Action

55.    On August 30, 2024, a securities class action complaint was filed in the United States District Court for the District of Massachusetts against the Company and the Officer Defendants.  The complaint alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5, in the case captioned: *Wentz v. Moderna, Inc., et al.*, Case 1:24-cv-12058 (D. Mass.) ("Securities Class Action").

56.    As a result of the wrongs complained of herein, the Individual Defendants have subjected the Company to the significant cost of defending itself and certain of the Company's former officers.  The Company will continue to incur significant sums in relation to the above Securities Class Actions and any liability or settlement that results.

**Unjust Compensation**

57.     At all relevant times, the Company paid lucrative compensation to certain of the Individual Defendants. The Company paid the Individual Defendants in connection with their respective roles as officers and/or directors of the Company.

58.     Accordingly, as part of their respective roles, the Individual Defendants were required to, among other things, exercise due care and diligence in the management and administration of the affairs of the Company, act ethically and in compliance with all laws and regulations, maintain adequate internal controls, and conduct business in a fair and transparent manner.  Further, each of the Individual Defendants had additional duties and responsibilities owed to the Company by virtue of their executive, directorial and/or committee roles, as described *supra*, for which they were compensated for.

59.     However, the Individual Defendants failed to carry out their duties adequately or at all, causing harm to the Company, as alleged herein.  Because the Individual Defendants failed to carry out their respective duties, the compensation they received during the Relevant Period was excessive and undeserved.  As such, the Individual Defendants were unjustly enriched to the detriment of the Company.

**Share Repurchases**

60.     On February 22, 2022, the Company's Board authorized an additional share repurchase program of the Company's common stock, with no expiration date, for up to $3.0 billion. On August 1, 2022, the Company's Board authorized an increase of $3.0 billion under the repurchase program for the Company's common stock, with no expiration date.

61.     Pursuant to the stock repurchase plan, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company, as follows:

| Date Range | Shares Repurchased | Avg. Price Paid per Share ($) | Approx. Total Price Paid ($) |
|---|---|---|---|
| March 2023 | 3,618,461 | 145.31 | 525,798,568 |
| April 2023 | 2,702,957 | 146.71 | 396,550,821 |
| May 2023 | 1,727,343 | 132.90 | 229,563,885 |
| **TOTAL** | **8,048,761** | **-** | **1,151,913,274** |

62.     Because the Company's common stock was actually worth $122.45 per share, the value on June 26, 2024 when the truth was revealed, the Company should have paid $985,570,784 for its share repurchases. However, the Individual Defendants caused the Company to repurchase its shares at artificially inflated prices, caused by the above-referenced false and misleading statements, thereby causing the Company to overpay for its own common stock by approximately $166,342,490.

**Additional Damage to the Company**

63.     In addition to the damages specified above, the Company will also suffer further losses in relation to any internal investigations and amounts paid to lawyers, accountants, and investigators in connection thereto.

64.     The Company will also suffer losses in relation to the Individual Defendants' failure to maintain adequate internal controls, including the expense involved with implementing and maintaining improved internal controls.

65.     As a direct and proximate result of the Individual Defendants' conduct, Moderna has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## CORPORATE GOVERNANCE

66.     At all relevant times, the Company had in place extensive corporate governance documents imposing duties and responsibilities on its directors and officers, and additional duties on the Company's committee members. Accordingly, each of the Individual Defendants were required to comply with the corporate governance documents, as detailed below.

67.     Despite the following corporate governance, the conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Individual Defendants were aware posed a risk of serious injury to the Company.

**Code of Conduct**

68.     At all relevant times, the Company had in place its Code of Ethics & Business Conduct ("Code of Conduct") which "applies to all directors, officers, employees, contractors and anyone who conducts business for on behalf of Moderna."

69.     The Code of Conduct opens with a message from Defendant Bancel which states "The Moderna Code of Ethics and Business Conduct is our guide to how we conduct ourselves and our activities globally."

70.     In a section entitled "We Protect Patients," the Code of Conduct states the following, in relevant part:

We Advance Science Responsibly

Nothing is more important to Moderna than the health and safety of those who receive our medicines. We are proud to advance healthcare through our research and development. We maintain high ethical and scientific standards, ensuring that our products are considered safe and effective for the benefit of society.

\*\*\*

20

We Prioritize Patients and the Communities We Serve

Patients and healthcare providers rely on our information, so we must act objectively, responsibly and transparently when we interact with them. Every decision we make is in service of delivering on the promise of mRNA.

\*\*\*

We Communicate Accurately

We are honest and transparent in our communications. Sharing accurate scientific information is vital to improving health across the world. The integrity of our information assures regulators and patients that our products are not misrepresented.

71.    In a section entitled "We Build Trust," the Code of Conduct states:

We Act Legally and Ethically

We do business the right way and make decisions ethically, and by doing this we build trust in Moderna and maintain our reputation.

\*\*\*

We Conduct Our Business with Transparency

We build trustworthy relationships with all stakeholders, including government officials, policymakers, trade associations or advocacy organizations, and we act with clear intent.

We build trust by transparently sharing information to enable well-informed public policy decisions and legislation that continues to promote innovation.

**Product Development Committee Charter**

72.    At all relevant times, the Company had in place its Product Development Committee Charter which set forth certain duties and responsibilities on the Product Development Committee members: Defendants Horning, Nabel, and Nader.

73.     Specifically, the Product Development Committee Charter states that the Committee has the following oversight responsibilities over "R&D Strategy and Product Development Assets and Programs":

- Review, evaluate and advise the Board regarding:

    o   the Company's R&D and product development strategy, assets and pipeline and the progression of the Company's development programs, including target product profile, "go/no go" to next phase criteria, clinical trial design and adherence to project timelines; the impact of a dynamic competitive landscape on the strategy and product development programs;

    o   the allocation, deployment, utilization of and investment in the Company's scientific assets;

    o   the advancement of any program to investment in a pivotal trial;

    o   investments in and development of the Company's technological development strategies;

    o   the Company's regulatory efforts and strategy;

    o   the risks associated with the Company's R&D and product development programs and regulatory matters and their management; and

    o   the quality of operational capabilities, to include systems to monitor and control the quality and safety of the Company's products and product candidates at all stages of the product life cycle.

**Audit Committee Charter**

74.     At all relevant times, the Company had in place its Audit Committee Charter which set forth certain duties and responsibilities on the Audit Committee members: Defendants Sagan, Tallett, and Berenson.

75.     With respect to "Audited Financial Statements and Annual Audit," the Audit Committee Charter provides, in relevant part:

• The Audit Committee shall review the overall audit plan (both external and internal (if any)) with the independent auditors, the internal auditors (if any) and the members of management who are responsible for preparing the Company's financial statements, including the Company's Chief Financial Officer and/or principal accounting officer or principal financial officer (the Chief Financial Officer and such other officer or officers are referred to herein collectively as the "Senior Accounting Executive").

• The Audit Committee shall review and discuss with management (including the Company's Senior Accounting Executive) and with the independent auditors the Company's annual audited financial statements and related disclosures prior to the filing of the Company's Annual Report on Form 10-K, including (a) all critical accounting policies and practices used or to be used by the Company, (b) the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," and (c) any significant financial reporting issues that have arisen in connection with the preparation of such audited financial statements.

• The Audit Committee must review:

(i)     any analyses prepared by management, the internal auditors (if any) and/or the independent auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements.  The Audit Committee may consider the ramifications of the use of such alternative disclosures and treatments on the financial statements, and the treatment preferred by the independent auditors.  The Audit Committee may also consider other material written communications between the registered public accounting firm and management, such as any management letter or schedule of unadjusted differences;

(ii)    major issues, if any, as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies;

(iii)   major issues, if any, regarding accounting principles and procedures and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles; and

(iv)    the effects of regulatory and accounting initiatives, as well as off-balance sheet transactions and structures, on the financial statements of the Company.

• The Audit Committee shall coordinate the oversight and review the adequacy of the Company's internal control over financial reporting.

76.     With respect to "Earnings Press Releases," the Audit Committee Charter states that "The Audit Committee shall review and discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies, including, in general, the types of information to be disclosed and the types of presentations to be made (paying particular attention to the use of "pro forma" or "adjusted" non-GAAP information)."

77.     In discussing "Legal and Regulatory Compliance," the Audit Committee Charter states:

• The Audit Committee may discuss with management and the independent auditors, and review with the Board, the legal and regulatory requirements applicable to the Company and its subsidiaries and the Company's compliance with such requirements.  After these discussions, the Audit Committee may, if it determines it to be appropriate, make recommendations to the Board with respect to the Company's policies and procedures regarding compliance with applicable laws and regulations.

• The Audit Committee may discuss with management legal matters (including pending or threatened litigation) that may have a material effect on the Company's financial statements or its compliance policies and procedures.

## DUTIES OF THE DIRECTOR DEFENDANTS

78.     As members of the Company's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

79.     The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

80.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director

Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith. The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner. The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

81. Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets. In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

82. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and investing public;

(b)     conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about

the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)    remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)    ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)    ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

83.    Each Director Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

84.    The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition of the

Company.  As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits and to structure settlements to resolve them.

<u>**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**</u>

85.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, gross mismanagement, and other wrongful conduct as alleged herein.

86.    Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

87.    Plaintiff is a current owner of the Company's common stock and has continuously been an owner of Company's common stock during all times relevant to the Director Defendants' wrongful course of conduct alleged herein.  Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

88.    Because of the facts set forth herein, Plaintiff has not made a demand on the Board to institute this action against the Individual Defendants.  Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

89.    The Company Board is currently comprised of eight (8) members –Defendants Afeyan, Bancel, Horning, Nabel, Nader, Sagan, Tallett, and Non-Party David M. Rubenstein (collectively, the "Current Directors"). Thus, Plaintiff is required to show that a majority of the Current Directors, *i.e.,* four (4), cannot exercise independent objective judgement about whether to bring this action or whether to vigorously prosecute this action.

90.     Each of the Director Defendants face a likelihood of liability in this action because they caused and/or permitted the Company to make false and misleading statements and omissions concerning the information described herein.  Because of their advisory, managerial, and directorial positions within the Company, the Director Defendants had knowledge of material, non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

91.     The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

92.     The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

93.     Each of the Director Defendants, by virtue of their roles, were required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner.  Despite this, the Director Defendants failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

94.     As a trusted Company directors, the Director Defendants conducted little, if any,

oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded their duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded their duties to protect corporate assets.

95.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

96.    Each of the Director Defendants reviewed, authorized, signed, and thus personally made and/or otherwise permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

97.    Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

98.    Despite having knowledge of the history of their own misconduct and mismanagement, the Director Defendants have failed and refused to seek recovery for Moderna for any of the misconduct alleged herein.

99.    Furthermore, despite having knowledge of their own misconduct and the Company's resulting artificially inflated share price, the Director Defendants authorized the harmful share repurchase plan and caused the Company to repurchase its own common stock at artificially inflated prices, thereby causing the Company to overpay for its own stock. As such, the Director Defendants face a substantial likelihood of liability therefor and are incapable of

independently considering a demand in the best interests of the Company.

## THE DIRECTOR DEFENDANTS ARE
## NOT INDEPENDENT OR DISINTERESTED

**Defendant Bancel**

100.    Defendant Bancel not disinterested or independent, and therefore, is incapable of considering demand because he (as its CEO) is an employee of the Company who derives substantially all of his income from his employment with Moderna, making him not independent. As such, Defendant Bancel cannot independently consider any demand to sue himself for breaching his fiduciary duties to Moderna, because that would expose him to liability and threaten his livelihood.

101.    As CEO, Defendant Bancel also fails the NASDAQ bright-line independence test and cannot, therefore, be considered independent, as admitted by the Company in its 2024 Proxy Statement. As such, Defendant Bancel could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Defendant Bancel is therefore futile.

102.    Defendant Bancel also personally reviewed, signed, authorized, and/or made the false and misleading statements alleged herein during earnings calls, in SEC filings, press releases, and in other public forums. Thus, as a main perpetrator of the wrongdoing alleged herein, Defendant Bancel is irreconcilably conflicted, faces a substantial likelihood of liability, and cannot consider a demand to sue.

103.    In addition, Defendant Bancel receives lucrative compensation in connection with his employment with the Company.  Defendant Bancel is not independent from Defendants Nabel, Nader, and Tallett as they comprise the Compensation and Talent Committee ("Compensation Committee") and are responsible for evaluating and determining the compensation of the CEO and Executive Officers, including Defendant Bancel. The purpose of the Compensation Committee is

to assist the Board in discharging its responsibilities related to the compensation provided by the Company to its CEO and Executive Officers.  Because of his status as an inside director, and the concomitant substantial compensation he receives, Defendant Bancel could not consider a demand adverse to the other Director Defendants serving on the Compensation Committee who are responsible for his financial future.

104.    Because of Defendant's Bancel's participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendant Bancel is unable to comply with his fiduciary duties and prosecute this action. Defendant Bancel is in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending himself in the Securities Class Action.

**Defendant Afeyan**

105.    Defendant Afeyan is one of the Co-Founders of Moderna. As such, Defendant Afeyan is irreconcilably conflicted and could not consider a demand to sue those who have helped build and run the Company he founded. Furthermore, Defendant Afeyan Co-Founded Moderna along with Defendant Langer.   In addition, between 2015 and 2019, Defendants Afeyan and Langer both served as directors of Rubius Therapuetics. As such, Defendant Afeyan could not reasonably bring a lawsuit against another Company Co-Founder, especially one he evidently has such a longstanding professional relationship with.

106.    Defendant Afeyan is also incapable of considering a demand to sue the Individual Defendants as a result of his longstanding professional relationships with Defendants Bancel and Berenson.  Specifically, Defendant Afeyan founded, and serves as Managing Partner and CEO, of Flagship Pioneering.  Meanwhile, Defendant Berenson serves as a Managing Partner of Flagship Pioneering, and Defendant Bancel serves as a Venture Partner. As such, Defendant Afeyan could

not reasonably consider a demand to sue those Defendants who he hired, and who help him run Flagship Pioneering.

107.    In addition, Defendant Afeyan's relationship with Defendant Berenson is further developed from their concurrent service as directors of Seres Therapeutics. Indeed, Defendant Afeyan served as a director of Seres Therapeutics from 2012 through to 2020. Meanwhile, Defendant Berenson has served as a director of Seres Therapeutics since 2019. Accordingly, Defendant Afeyan has a close working relationship with Defendant Berenson and could not consider a demand to sue.

**Defendants Tallett and Bancel**

108.    Defendants Tallett and Bancel could not consider a demand to sue one another as a result of their longstanding professional relationship, stemming from at least 2013. Specifically, Defendant Tallett has served as a director of Qiagen since 2011. Meanwhile, Defendant Bancel served as a director of Qiagen from 2013 through to 2021. As a result, Defendants Bancel and Tallett are each indebted to one another and could not consider a demand to sue.

**Defendants Tallett and Sagan**

109.    During the Relevant Period, Defendants Tallett and Sagan served as members of the Audit Committee. Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia,* overseeing the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company and the audits of the financial statements of the Company, and otherwise meet their responsibilities as set forth in the Audit Committee Charter as set forth herein.

110.    Defendants breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to

be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. Therefore, Defendants Tallett and Sagan face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

**Defendants Horning, Nabel and Nader**

111.    During the Relevant Period, Defendants Horning, Nabel and Nader served as members of the Product Development Committee.  As discussed *supra*, the Product Development Committee are responsible for the Company's R&D and product development strategy, assets and pipeline and the progression of the Company's development programs, as well as the Company's regulatory efforts and strategy,

112.    Despite this, Defendants Horning, Nabel, and Nader breached their fiduciary duties by permitting the Company to make the false and misleading statements regarding the effectiveness and commercial prospects of mRNA-1345. Therefore, Defendants Horning, Nabel and Nader face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

**Additional Reasons Demand is Futile**

113.    The Company has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Current Directors have not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

114.    The Company, at all material times, had its Code of Conduct and related corporate governance policies which required each of the Individual Defendants to maintain the highest standards of honesty and integrity, particularly in relation to accurate and truthful public

disclosures. Yet, despite this Code of Conduct and other relevant policies and committee charters, each of the Director Defendants failed to ensure that the Company upheld high standards of integrity, misrepresented facts to the investing public, and failed to report any concerns, or investigate any misconduct, let alone commence litigation against the Individual Defendants.

115.    In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, and unjust enrichment. In violation of the Code of Conduct, the Director Defendants failed to comply with laws and regulations, failed to maintain the accuracy of company records, public reports, and communications, and failed to uphold the responsibilities related thereto. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

116.    The Director Defendants received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board. They have benefitted from the wrongs alleged herein and have engaged therein to preserve their positions of control and the prerequisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

117.    The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable

of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

118.    Publicly traded companies, such as Moderna, typically carry director and officer liability insurance from which the Company could potentially recover some or all of its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover the Company's damages. If no such insurance is carried, then the Current Directors will not cause the Company to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event.

119.    Accordingly, each of the Current Directors, and at least a majority of them, cannot reasonably consider a demand with the requisite disinterestedness and independence. Indeed, any demand upon the Current Directors is futile and, thus, excused.

## CLAIMS FOR RELIEF

## COUNT I

### (Against the Individual Defendants for Breach of Fiduciary Duties)

120.    Plaintiff incorporates by reference and re-allege each and every allegation contained above, as though fully set forth herein.

121.    The Individual Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

122.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

123.    The Individual Defendants engaged in a sustained and systematic failure to properly

exercise their fiduciary duties.  Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly reported financials.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

124.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

125.    As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## COUNT II

### (Against the Individual Defendants for Gross Mismanagement)

126.    Plaintiff incorporates by reference and re-allege each allegation contained above, as though fully set forth herein.

127.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

128.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

129.    Because of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

## COUNT III

### (Against the Individual Defendants for Waste of Corporate Assets)

130.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

131.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and ongoing harm to the Company.

132.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend the Officer Defendants' unlawful actions; and (iv) authorizing a harmful share repurchase program and causing the Company to repurchase its own common stock at artificially inflated prices.

133.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

## COUNT IV

### (Against The Individual Defendants for Unjust Enrichment)

134.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

135.    By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and the detriment of, the Company

136.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

137.    Plaintiff, as a shareholder and representative of the Company seeks restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

## COUNT V

### (Against the Individual Defendants for Aiding and Abetting)

138.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

139.    The Director Defendants exploited, aided and abetted, and were knowing and culpable participants to the breaches of fiduciary duty by the Officer Defendants. Likewise, the Officer Defendants exploited, aided and abetted, and were knowing and culpable participants to the breaches of fiduciary duty by the Director Defendants.

140.    Specifically, the Director Defendants, in violation of the Company's corporate governance, engaged in and/or permitted the Company to engage in the scheme to issue materially false and misleading statements to the public, including in the Company's SEC filings, and by

facilitating and disguising the Officer Defendants' violations of law as alleged herein, and failing to report the same.

141.    The Officer Defendants, in violation of the Company's corporate governance, engaged in and/or permitted the Officer Defendants' lack of oversight and scheme to issue materially false and misleading statements to the Company's shareholders to secure, *inter alia*, the re-election of certain Director Defendants, by facilitating and disguising the Director Defendants' violations of law as alleged herein, and failing to report the same.

142.    As a result, the Director Defendants substantially assisted the Officer Defendants, and the Officer Defendants substantially assisted the Director Defendants in breaching their fiduciary duties and in committing the other wrongful and unlawful conduct as alleged herein

143.    As a direct and proximate result of the aiding and abetting the breaches of fiduciary duty alleged herein, the Company has sustained and will continue to sustain significant damages.

144.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

### **COUNT VI**

#### **(Against the Individual Defendants for Violations of
Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934)**

145.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

146.    During the Relevant Period, the Individual Defendants disseminated and/or approved public statements that failed to disclose that the above-referenced truthful facts and as a result of the foregoing, the Individual Defendants' public statements were materially false and misleading at all relevant times.  Thus, the price of the Company's shares was artificially inflated due to the deception of the Individual Defendants.  Despite this artificial inflation in the price of

the Company's shares, the Individual Defendants caused and/or allowed the Company to repurchase many millions of shares of Company stock, thereby causing significant financial harm to the Company.

147.    As alleged herein, the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Moderna, their control over, and/or receipt and/or modification of Moderna's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Moderna, participated in the fraudulent scheme alleged herein.

148.    The Individual Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Relevant Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

149.    The Individual Defendants were each members of Moderna's Board and senior management team during the aforesaid time period. Based on their roles at Moderna, each of the Individual Defendants would have been involved with, or knowledgeable about, the wrongdoing alleged herein.

150.    At a minimum, the Individual Defendants failed to review or check information that they had a duty to monitor or ignored obvious signs that their statements were materially false and misleading or contained material omissions.  Given the nature and extent of the problems at Moderna, the Individual Defendants knew and/or recklessly disregarded the extent and scope of their statements during the Relevant Period.

151.    Likewise, the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and financial condition, as alleged herein.  The Individual Defendants had the ultimate authority over and were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements regarding the Company were being issued, and approved or ratified these statements, in violation of the federal securities laws.

152.    As such the Individual Defendants caused the Company to violate section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; and (ii)  made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

153.    As a result of the wrongful conduct as alleged herein, the Individual Defendants have violated Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder and are thus liable for any harm caused to the Company.

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment as follows:

A.      Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.      Awarding, against all the Individual Defendants and in favor of the Company, the damages sustained by the Company as a result of the Individual Defendants' breaches of their fiduciary duties, gross mismanagement, unjust enrichment, waste of corporate assets, aiding and abetting, and violations of Section 10(b) of the Exchange Act;

C.      Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated:  September 23, 2024

                                        **LAW OFFICE OF MICHAEL P. UTKE, LLC**


                                        By:  */s/ Michael P. Utke*
                                              Michael P. Utke
                                        P.O. Box 360 Pepperell, MA 01463
                                        Telephone: (617) 314-6600
                                        Email: mutke@utkelaw.com

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
260 Madison Ave., 22nd Floor
New York, NY 10016
Tel: (212) 983-1300
Fax: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

*Attorneys for Plaintiff*